# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Prime-Site Media, LLC,                    Case No.

    Plaintiff,                          Hon.

v.                                        **COMPLAINT**

Charter Township of Chesterfield,

    Defendant.

---

Donald R. Sheff II (P78262)
PRIME SITE MEDIA, LLC
Attorney for Plaintiff
220 South Main Street
Royal Oak, Michigan 48067
248-289-5895
dsheff@primesitellc.com

---

1

## COMPLAINT

Prime Site Media, LLC ("PSM") complains against defendant Charter Township of Chesterfield ("Chesterfield" or the "Township") as follows:

## INTRODUCTION

1.      Chesterfield regulates the display of signs through Chapter 52 of the Chesterfield Charter Township Code (the "Sign Ordinance").

2.      The Sign Ordinance constitutes a facially unconstitutional prior restraint on speech because it vests Township officials with open-ended discretion to modify any of its sign restrictions on a case-by-case basis.

3.      The Sign Ordinance also constitutes a facially unconstitutional regulation of speech because it is not narrowly tailored to achieve a compelling or substantial government interest.

4.      PSM challenges the constitutionality of Chesterfield's Sign Ordinance on its face under the First Amendment.

5.      PSM seeks declaratory and injunctive relief, in addition to recovery of its significant (and continuing) damages it has unjustly sustained as a result of the violation of its First Amendment rights.

## PARTIES

6.     PSM is a Michigan limited liability company with its principal place of business located in the City of Royal Oak, County of Oakland, and State of Michigan.

7.     Chesterfield is a Michigan municipal corporation located in Macomb County, Michigan.

## JURISDICTION AND VENUE

8.     This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. § 1983.

9.     The Court has jurisdiction over this action under 28 U.S.C. § 1331 because PSM asserts claims arising under the United States Constitution and 42 U.S.C. § 1983.

10.     The Court has jurisdiction over this action under 28 U.S.C. § 1343(a) (3) and (4) because PSM seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

11.     Venue is proper in the Court under 28 U.S.C. § 1391(b)(1) and (2) because the Defendant resides and PSM's claims arose in this judicial district.

## FACTUAL BACKGROUND

### I. Chesterfield's Sign Ordinance.

12.     The Sign Ordinance, in its entirety, is attached to this Complaint as **Exhibit A** and is incorporated herein.

13.     The several sections of the Sign Ordinance are interdependent and constitute one comprehensive act for the licensing and regulation of signs in the Township.

14.     Chesterfield threatens civil prosecution, penalties, and fines for those who violate its Sign Ordinance. The Sign Ordinance states that "[e]ach day that a violation continues shall be deemed a separate violation." Section 52-12(b).

15.     Chesterfield states that "[r]egulating the size and location of signage in the <u>most narrowly tailored manner</u> represents the least restrictive means of addressing [its] targeted government interests." Section 52-2 (emphasis added).

16.     The Sign Ordinance functions as a prior restraint on speech in at least two ways:

      a. First, any person wishing to display an "Outdoor Advertising" ("OA") sign in Chesterfield must first obtain "approval" from the Planning Commission to do so. Section 52-10.

      b. Second, the Sign Ordinance operates as a prior restraint on speech by incorporating its own sign variance process by which a speaker must first seek approval from the Township to display a sign that

4

would otherwise violate the underlying dimensional restrictions in

Sign Ordinance. Section 52-11.

17.     Specifically, the Sign Ordinance states that "[t]he Planning

Commission <u>may</u> vary [the] dimensional provisions of [the Sign Ordinance]."

Section 52-11(a). (emphasis added).

18.     As the Sign Ordinance makes clear, the Township retains discretion to

issue a variance. Chesterfield Charter Township Code,  Section 1-2 Definitions &

rules of construction ("'Shall' is mandatory, and the term 'may' is permissive.").

19.     Additionally, the criteria by which the Township "may" decide to grant

sign variances under the Ordinance are subjective and arbitrary.

20.     Some of these criteria include whether 1) "[t]here are <u>special</u>

<u>circumstances or conditions</u>, such as the existence of buildings, topography,

vegetation, sign structures, lot dimensions, or other matters on the lot or on adjacent

lots or within the adjacent public right-of-way, which would <u>substantially restrict</u> the

<u>effectiveness</u> of the sign in question"; 2) "[s]trict enforcement of the provisions of

this chapter would serve no <u>useful purpose</u>"; 3) "[t]he type of sign structure and the

location proposed would not pose <u>a significant risk</u> to the public health, safety and

welfare"; 4) "[t]he <u>benefit</u> of the sign to the general public and/or applicant under

the circumstances <u>outweighs</u> any <u>risk</u> to traffic safety and <u>the Township's desire</u> to

eliminate the accumulation of visual clutter <u>in accordance with the stated purpose of</u>

this chapter"; and 5) "[a] variance would be in <u>the interest of the Township</u> and not against <u>the spirit and intent of this chapter</u>." Section 52-11(a)(1)-(5)

21.    Additionally, the Sign Ordinance states that "[a]ny variance shall be granted only to the extent of <u>rendering equity</u> with the rights granted by this chapter to others <u>with similar uses in similar districts</u>. Section 52-11(a)(1).

22.    The Sign Ordinance does not define the standards enumerated in Section 52-11(a)(1) through (5).

23.    For instance, it's anyone's guess what will be considered "special circumstances or conditions" (as opposed to circumstances that are not "special"?).

24.    How criteria like "useful purpose," "benefit," "significant risk" (as opposed to a less-than-significant "risk"?) will be measured, let alone how the Township will determine whether such "benefit" "outweighs" any "risk" is anyone's guess.

25.    Similarly, how "the spirit and intent" of the Sign Ordinance will be measured, or what exactly constitutes "similar uses" or "similar districts" (how "similar" do they have to be?) is entirely subjective and ambiguous; the prospective speaker would have to ask the individual members of the Township's Planning Commission to know for sure.

26.    Furthermore, judgments about whether "public health, safety and welfare" would be served by a sign variance have been long held by the Supreme

6

Court as arbitrary and subjective criteria that renders the scheme an unconstitutional prior restraint on speech. *See Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 149-50 (1969) (explaining that because a city commission was able to grant or deny a permit for public demonstrations based on its judgment of whether the "public welfare, peace, safety, health, decency, good order, morals or convenience" would be served, "[t]here can be no doubt that the [city] ordinance, as it was written, conferred upon the City Commission virtually unbridled and absolute power" in the licensing of protected expression because "in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'").

27.     Notably, the Sign Ordinance contains no standards for Chesterfield to use when denying a sign variance.

28.     The Sign Ordinance does not contain a severability clause

29.     Chesterfield has enacted and enforces its Sign Ordinance under color of state law.

## II. PSM's Proposed Speech.

30.     PSM is engaged in the business of erecting and maintaining outdoor advertising displays, commonly known as billboards, on property it leases for that

purpose. PSM earns revenue by charging advertisers to display their messages on its billboards.

31.    PSM's signs display a wide range of noncommercial and truthful commercial messages. For example, the messages on PSM's billboards involve political issues, paid and unpaid religious messages, unpaid memorial tributes, directional messages, patriotic content, political content, real estate advertisements, product promotions, brand awareness campaigns, and employment opportunities.

32.    Signs like the one PSM proposes to erect in Chesterfield incorporate unique technology that allow Amber Alerts, real-time weather warnings, and other time-sensitive emergency messages to be communicated to the public instantly – often acting as a means of disseminating critical government and other public service messages.

33.    PSM desires to display a digital billboard (the "Proposed Sign") at a parcel of real property adjacent to 23 Mile Road (that portion of which designated highway M-3) in Chesterfield Township identified by parcel/tax identification number 09-20-201-022 with permission of the property owner (the "Proposed Site").

34.    PSM satisfies all requirements for approval from the Michigan Department of Transportation under Michigan's Highway Advertising Act, M.C.L. § 252.301, et seq., for the erection of a billboard at its proposed location in Chesterfield Township.

35.     The sign that PSM proposes to erect in Chesterfield represents an extremely critical means of First Amendment communication.

## LEGAL BACKGROUND

36.     "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1).

### III. Prior restraints on speech.

#### A. The substantive constitutional doctrine.

37.     The requirement of government approval, by way of a license, permit, or otherwise, before engaging in expression is a prior restraint that is presumed to be unconstitutional unless certain safeguards are met, including, but not limited to, definite and objective standards to guide the decision to issue a permit.

#### B. Standing to challenge a prior restraint.

38.     The Supreme Court states that "it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. State of Md.*, 380 U.S. 51, 56 (1965).

9

39.     The Supreme Court also emphasizes that a challenge to a prior restraint on speech does not mean the speaker "has restricted himself to an attack on that section alone, and lacks standing to challenge any of the other provisions (or alleged shortcomings) of the statute," but may challenge the licensing scheme in its "concrete statutory context" where it "effects an invalid prior restraint because the structure of the other provisions of the statute contributes to the infirmity." *Id.* (cleaned up).

40.     Recently, the Sixth Circuit specifically addressed standing to attack a sign ordinance based on its constitutionally repugnant variance scheme, explaining that "[i]t would amount to circular logic to say that [a speaker] lacks standing to challenge [a sign] ordinance because it challenges the very provision that gives it standing to challenge the ordinance. Such an approach would render the constitutionality of most variance provisions unreviewable." *Int'l Outdoor, Inc. v. City of Troy, Mich.*, 974 F.3d 690, 702 (6th Cir. 2020).

**C. The constitutional challenge to Chesterfield's prior restraint on speech is necessarily a facial challenge.**

41.     "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015).

42.     "[T]he [Supreme] Court has allowed such challenges to proceed under a diverse array of constitutional provisions." *Id.* (citing *Sorrell v. IMS Health Inc.*,

564 U.S. 552 (2011) for the proposition that "such challenges" may proceed under the First Amendment).

43.    Specifically, when it comes to constitutional challenges to prior restraints on speech, the Supreme Court holds that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law *may challenge it facially* without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988) (citations omitted) (emphasis added).

44.    This is because unlawful prior restraints on speech necessarily "engender identifiable risks to free expression that can be effectively alleviated *only through a facial challenge*" and that it is "*the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion*." *Id.* at 757 (cleaned up) (first emphasis added).

45.    When a speaker files suit alleging a "statute[ ] threaten[s] these risks to a significant degree" the Supreme Court's instructions could not be more clear: "courts must entertain an immediate facial attack on the law." *Id.* at 759 (emphasis added).

**D. Prior restraints are inseverable from the speech restrictions to which they pertain.**

11

46.     The Supreme Court has often repeated that "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (emphasis added) (cleaned up).

47.     To that end, the Supreme Court is "mindful that [its] constitutional mandate and institutional competence are limited" and that it must "restrain [itself] from rewriting state law to conform it to constitutional requirements even as [it] strive[s] to salvage it." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (cleaned up).

48.     The Supreme Court's "ability to devise a judicial remedy that does not entail quintessentially legislative work often depends on how clearly [it] ha[s] already articulated the background constitutional rules at issue and how easily [it] can articulate the remedy." *Id.*

49.     The "background constitutional rules" that govern the prior restraint doctrine are clear.

50.     "Prior restraints are not unconstitutional per se." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (citations omitted).

51.     Rather, an unlawful prior restraint's constitutional defect inheres in its "*absence* of expressed standards" which "effectively gives the [government]

unbridled discretion to deny applications" to speak. *Lakewood*, 486 U.S. at 755-58 (emphasis added).

52.     When it comes to unconstitutional prior restraints on speech, the Supreme Court has clearly "articulate[d] the remedy": the government must "*incorporate* the required procedural safeguards in the statutory scheme." *Freedman*, 380 U.S. at 60 (emphasis added).

53.     The doctrine of severance does not operate to "incorporate" anything into a constitutionally defective law.

54.     Under Michigan law, "[t]o be capable of separate enforcement, the valid portion of the statute must be independent of the invalid sections forming a complete act within itself." *Pletz v. Sec'y of State*, 336 N.W.2d 789, 809 (1983).

55.     However, the Sixth Circuit makes clear that: a "variance provision of [a] . . . Sign Ordinance . . . is not independent from other provisions of the ordinance, but rather inextricably linked to them by providing a way of relaxing the very restrictions imposed by the Sign Ordinance." *Troy*, 974 F.3d at 702.

56.     Because the Sign Ordinance contains a variance provision that "provid[es] a way of relaxing the very restrictions imposed by the Sign Ordinance" in this case, it "is not independent from other provisions of the ordinance," and, therefore, is inseverable under Michigan law. *Compare id.*, *with Pletz*, 336 N.W.2d at 809.

**IV. Speech codes.**

   **A. Content-based speech codes.**

57.   "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (quoting *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).

58.   "Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech. That is why the First Amendment expressly targets the operation of the laws—*i.e.,* the "abridgement of speech"— rather than merely the motives of those who enacted them. *Reed*, 576 U.S. at 167 (quoting U.S. Const., Amdt. 1) (cleaned up).

59.   "The vice of content-based legislation . . . is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes." *Id.* (cleaned up).

60.   The Sixth Circuit recently held that a single content-based provision of a sign code rendered the <u>entire</u> chapter of outdoor advertising sign regulations content-based on its face. *Norton Outdoor Advert., Inc. v. Vill. of St. Bernard, Ohio,*

14

99 F.4th 840, 847-850 (6th Cir. 2024) ("Because Chapter 711 contains a content-based exemption, we must apply strict scrutiny.").

61.     A regulation of speech that is content based is "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

62.     To be constitutional, content-based speech codes must survive review under strict scrutiny.

63.     "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (2015) (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

64.     To satisfy strict scrutiny, the government bears the burden to demonstrate its content-based speech code is narrowly tailored to achieve a compelling government interest.

**B. Content-neutral restrictions on speech.**

65.     A law that "does not draw content-based distinctions on its face" is considered facially content-neutral. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014).

66.     To be constitutional, content-neutral restrictions on speech must survive review under intermediate scrutiny.

67.     To satisfy intermediate scrutiny, the government bears the burden to demonstrate its content-neutral speech code is narrowly tailored and does not burden more speech than necessary to achieve a substantial governmental interest.

**C. Tailoring defects.**

68.     The Supreme Court has identified "two analytically distinct grounds for challenging the constitutionality of a municipal ordinance regulating the display of signs" based on the ordinance's tailoring. *City of Ladue v. Gilleo*, 512 U.S. 43, 50 (1994).

69.     First, a speech code may be unconstitutional because it is overinclusive.

70.     If a speech code is overinclusive, it is "subject to attack on the ground that [it] simply prohibit[s] too much protected speech. *Id.* at 51 (citations omitted).

71.     Second, a speech code may be unconstitutional because it is underinclusive.

72.     The underinclusiveness doctrine states that "a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002) (cleaned up).

73.     When a speech code is found to be unconstitutional because it is underinclusive, the speech code, in its entirety, is declared unconstitutional. *See e.g.*,

16

*Reed*, 576 U.S. at 172 (emphasis added) ("In light of [its] underinclusiveness . . . . *the Sign Code* fails strict scrutiny); *Arkansas Writers' Project, Inc.*, 481 U.S. at 232-34 (1987) (emphasis added) (finding that the magazine tax scheme was "both overinclusive and underinclusive" and holding "*the tax* [was] therefore invalid under the First Amendment"); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999) (citations omitted) (emphasis added) (holding that the "*regulatory regime* [was] so pierced by exemptions and inconsistencies that the Government [could not] hope to exonerate it").

74.    A speech code's underinclusivity also gives rise to two other related, but jurisprudentially distinct infirmities. First, the Supreme Court points out that "the exemptions in [such] ordinance[s] . . . shed light on the separate question whether the ordinance prohibits too much speech." *Gilleo*, 512 U.S. at 52. And second, by embedding exemptions within a speech code the government "diminish[es] the credibility of the [its] rationale for restricting speech in the first place" and, therefore, calls into question the asserted governmental interest(s) in restricting protected expression. *Id.* (citation omitted).

**D. Standing to challenge an ordinance restricting speech.**

75.    To have standing to challenge an ordinance restricting protected speech, a speaker "must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the

requested relief." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022) (citation omitted).

76.   The essence of an Article III injury is the "invasion of a legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

77.   The First Amendment to the U.S. Constitution establishes a legally protected interest in the right to free speech.

78.   The Supreme Court has developed doctrinal tests to specify when a restriction on speech invades the free speech interests secured by the First Amendment.

79.   The Supreme Court holds that free speech is "among the *fundamental personal* rights . . . protected by the Fourteenth Amendment from *invasion by state action*" and "[i]t is also well settled that municipal ordinances adopted under state authority *constitute state action* and are within the prohibition of the amendment." *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 450 (1938) (citations omitted) (emphasis added).

80.   "Governmental activity constitutes an injury-in-fact when 'the challenged exercise of governmental power is regulatory, proscriptive, or compulsory in nature, and the complainant is either presently or prospectively subject to the regulations, proscriptions, or compulsions that he is challenging.'"

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 at 764–65 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)) (cleaned up).

81.     A speaker who is subject to an unconstitutional regulation of speech sustains an Article III injury that is "traceable to the operation of [the law] itself." *Cruz*, 596 U.S. at 301.

82.     A speaker may redress their injury by requesting the ordinance be declared unconstitutional, enjoined, and/or by seeking an award of damages. *See e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (holding that even "nominal damages satisfies the redressability element of standing").

### E.  The constitutionality of laws restricting speech are tested on their face.

83.     The availability of a facial challenge turns on the applicable substantive constitutional tests necessary to evaluate the constitutionality of the challenged law.

84.     "[A] plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the law would be valid." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (cleaned up).

85.     A content-based speech code "can stand *only* if [it] survive[s] strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (cleaned up) (emphasis added).

86.     In parallel, "[content-neutral] restrictions . . . are valid *provided* that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (emphasis added).

87.     Because there are "no set of circumstances" where a municipal sign ordinance that fails review under strict or intermediate scrutiny "would be valid," the Ordinance is vulnerable to a facial challenge by a speaker whose speech is regulated under the scheme. *Compare id., with AFPF*, 141 S. Ct. at 2387.

**V. PSM's free speech rights.**

88.     Billboard advertising is a form of speech protected under the First and Fourteenth Amendments to the U.S. Constitution.

89.     Under the First Amendment, PSM has the right to have its speech be regulated under a constitutionally valid rule of law.

90.     In *Metromedia, Inc. v. City of San Diego*, the Supreme Court explained that "[t]he outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas. From the poster or 'broadside' to the billboard, outdoor signs have played a prominent role throughout American history, rallying support for political and social causes." 453 U.S. at 501 (cleaned up).

91.     PSM's First Amendment rights have been and continue to be violated because its speech is burdened by Chesterfield's facially unconstitutional Sign Ordinance.

92.     PSM desires to erect at least one billboard in the Township.

93.     The Sign Ordinance makes it illegal to erect its Proposed Sign at the Proposed Site (unless Chesterfield grants PSM a sign variance to do so).

94.     PSM is refraining from erecting its Proposed Sign at the Proposed Site, and, therefore, refraining from engaging in protected speech because of Chesterfield's credible threat of both civil penalties and fines for those that violate its Sign Ordinance.

## COUNT I
## 42 U.S.C. § 1983 DEPRIVATION OF
## CIVIL RIGHTS UNDER COLOR OF STATE LAW —
## UNCONSTITUTIONAL SPEECH CODE
### (Unconstitutional Prior Restraint on Speech)

95.     PSM incorporates by reference paragraphs 1-94 above.

96.     PSM may only display its Proposed Sign at the Proposed Site if it receives a sign variance from the Township to do so.

97.     However, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth*, 394 U.S. at 150-151.

21

98.     The Sign Ordinance is facially unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution because it functions as an unconstitutional prior restraint on speech.

99.     Chesterfield expressly possesses unfettered discretion in the decision to grant sign variances to the Sign Ordinance.

100.    Chesterfield possesses unfettered discretion in the decision to grant sign variances to the Sign Ordinance because the scheme lacks narrow, objective, and definite standards to guide its decision.

101.    Chesterfield possesses unbridled discretion in making the decision to grant a sign variance from the Sign Ordinance based on subjective and arbitrary criteria that is antithetical to the First Amendment.

102.    Chesterfield possesses unfettered discretion in the decision to deny a sign variance to the Sign Ordinance because the scheme lacks objective standards to guide its decision.

103.    The overall structure of the Sign Ordinance contributes to its constitutionally infirm scheme of prior restraint.

104.    Chesterfield's sign variance scheme is not independent from other provisions of its Sign Ordinance, but rather inextricably linked to them by providing an open-ended way of relaxing or eliminating the very restrictions the Ordinance seeks to impose on speakers.

105.   In particular, Chesterfield's sign variance scheme is not independent from the size, height, location and other specific regulations that purport to regulate PSM's proposed speech, but is rather inextricably linked to them by providing an open-ended way of relaxing or eliminating those very restrictions.

106.   Under the Sign Ordinance, the restrictions imposed on disfavored speech necessarily force disfavored speakers (if they wish to speak at all) to submit themselves to the Ordinance's arbitrary sign variance scheme.

107.   Due to the prospect of having to submit itself to the unchecked and unbridled discretion of Chesterfield's officials, PSM has not sought a sign variance necessary to display its Proposed Sign and, as a result, its intended speech has been altered and deterred by Chesterfield's unlawful variance scheme.

108.   Due to the prospect of having to submit itself to the unchecked and unbridled discretion of Chesterfield's officials, PSM has not sought the sign variance necessary to display other billboards in the Township and, as a result, its intended speech has been altered and deterred by Chesterfield's unlawful scheme.

109.   Due to the prospect of having to submit itself to the unchecked and unbridled discretion of Chesterfield's officials, PSM is self-censoring its speech.

110.   PSM has suffered, and will continue to suffer, harm including financial harm, due to the unconstitutional regulatory burdens Chesterfield imposes on its speech.

111.   PSM has suffered, and will continue to suffer, harm including financial harm, because of its inability to erect and use its Proposed Sign under the unconstitutional Sign Ordinance.

WHEREFORE, Plaintiff PSM prays for judgment against Chesterfield granting PSM injunctive and declaratory relief and awarding it damages in an amount to be determined at trial, together with attorney fees and other fees authorized by 42 U.S.C. § 1988, plus costs and interest, along with any other further relief the Court may deem just, proper, and equitable.

## COUNT II
### 42 U.S.C. § 1983 DEPRIVATION OF
### CIVIL RIGHTS UNDER COLOR OF STATE LAW —
### UNCONSTITUTIONAL CONTENT-BASED SPEECH CODE
#### (No Compelling Government Interest/Defective Tailoring)

112.   PSM incorporates by reference paragraphs 1-111 above.

113.   The Sign Ordinance is unconstitutional on its face under the First and Fourteenth Amendments to the U.S. Constitution because it constitutes a facially content-based regulation of speech that lacks a compelling government interest.

114.   The Sign Ordinance is content based on its face because it constitutes "[a] government regulation that allows arbitrary application." *Forsyth*, 505 U.S. at 130 (cleaned up).

115.   Under the First and Fourteenth Amendment, any attempt by Chesterfield to regulate or restrict PSM's display of its signs through the use of a

content-based scheme must advance a compelling government interest and be narrowly tailored to achieve that interest.

116. Chesterfield's content-based Sign Ordinance is facially unconstitutional because it lacks a compelling government interest.

117. Separately, the Sign Ordinance is facially unconstitutional because it is not narrowly tailored to advance any compelling governmental interest – it is underinclusive.

118. The Sign Ordinance is not narrowly tailored because it establishes vast restrictions on signs, but allows its restrictions to be relaxed or waived altogether if the speaker obtains a sign variance.

WHEREFORE, Plaintiff PSM prays for judgment against Chesterfield granting PSM injunctive and declaratory relief and awarding it damages in an amount to be determined at trial, together with attorney fees and other fees authorized by 42 U.S.C. § 1988, plus costs and interest, along with any other further relief the Court may deem just, proper, and equitable.

### COUNT III
### 42 U.S.C. § 1983 DEPRIVATION OF
### CIVIL RIGHTS UNDER COLOR OF STATE LAW —
### UNCONSTITUTIONAL SPEECH CODE
### (Intermediate Scrutiny - Defective Tailoring)

119. PSM incorporates by reference paragraphs 1-118 above and incorporates the following into the previous Counts where applicable.

25

120.   The Sign Ordinance, on its face, is not narrowly tailored to advance a substantial government interest.

121.   The fact that the Township *may* relax or waive its sign restrictions at its discretion on a case-by-case basis undermines any claim of narrow tailoring.

122.   If the Township's interests in sign regulation were truly (or even approximately) served by the Sign Ordinance's restrictions on speech, there would be no need to incorporate a mechanism to arbitrarily waive or alter those rules at the discretion of Township officials.

123.   At the same time, the structure of the Sign Ordinance is tantamount to a confession by Chesterfield that its scheme is overinclusive by its very nature – otherwise (logically) there would be no need to allow Township officials to bend its signage rules at their discretion based on its subjective determinations.

WHEREFORE, Plaintiff PSM prays for judgment against Chesterfield granting PSM injunctive and declaratory relief and awarding it damages in an amount to be determined at trial, together with attorney fees and other fees authorized by 42 U.S.C. § 1988, plus costs and interest, along with any other further relief the Court may deem just, proper, and equitable.

Respectfully submitted,

By:/s/Donald R. Sheff II
    Donald R. Sheff II (P78262)
General Counsel
PRIME-SITE MEDIA, LLC
Attorney for Plaintiff
220 South Main Street
Royal Oak, Michigan 48067
248-289-5895
dsheff@primesitellc.com

Date: September 29, 2025